**In re Donald L. DOGGETT, Debtor.**

**CHASE MANHATTAN BANK (USA) NA, Plaintiff,**

**v.**

**Donald L. DOGGETT, Defendant.**

**Bankruptcy No. 3–86–00273.
Adv. No. 3–86–0095.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

April 30, 1987.

[black redaction bars]

Stephen A. Santangelo, Columbus, Ohio, for plaintiff.

Scott Stout, Dayton, Ohio, for defendant/debtor.

Thomas B. Talbott, Jr., Dayton, Ohio, Trustee.

## DECISION AND ORDER

WILLIAM A. CLARK, Bankruptcy Judge.

Dated at Dayton, Ohio in said District on the 30th day of April, 1987.

This case arises under 28 U.S.C. § 1334(a) and having been referred to this court is determined to be a core proceeding under 28 U.S.C. § 157(a)(2)(I).

The matter is before the Court upon the plaintiff's complaint to determine the dischargeability of the debt owing to plaintiff resulting from charges against a Master-Card credit card account made by defendant. Following the trial on January 15, 1987 counsel for each party provided the Court post-trial briefs.

Evidence at the trial established the final amount due on the account to be $7,172.86 as of January 28, 1986 (Exhibit 8). The complaint of plaintiff alleged the sum due to be $7,209.65. Defendant's answer is a general denial. Plaintiff relies upon 11 U.S.C. § 523(a)(2)(A) which reads as follows:

Sec. 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, [or 1328(b)], 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

\* \* \* \* \* \*

11 U.S.C. § 523(a)(2)(A)

Plaintiff has the burden to prove its case under the statute by clear and convincing evidence. *In re Martin*, 761 F.2d 1163 (6th Cir.1985).

## FACTS

Donald L. Doggett accepted a pre-approved Chase Manhattan Credit Card with a credit line of $3500 by signing and returning a "Request Coupon" in early July 1985. After plaintiff issued the card defendant used the card for the first time on July 13, 1985. Defendant charged transactions of $819.52 to the card until July 28, 1985. In August Defendant charged against the card until the balance was $1,505.41 on August 28, 1985. Defendant made his first payment of $50 on September 3, 1985. Defendant continued charging to the card in September and made a $70 payment on September 23, 1985. On September 28, 1985 the balance due on the card was $2,713. For the period from July until the end of September 28, 1985 defendant charged no more than two charges at any one store daily with the exception of September 27, when three charges were made at an Elder Beerman store. The balance due on the card on October 28, 1985 was $3,655.20.

Plaintiff established that the "floor limit" for this card was $50, which required a merchant to call for approval on a charge of more than $50.

The credit line was listed as $3,500 on each statement and on the pre-approved application which defendant signed. Defendant testified that he thought the credit limit authorized was $5,000. Beginning on November 8, 1985 the defendant made numerous charges, including five separate charges at an Elder Beerman store on November 10 and eight charges there on November 13. On each of those days all of the charges were for less than $50. All of the fifty-six (56) charge transactions for the month closing November 28, 1985 were for a sum of less than $50. The defendant had not charged more than twenty separate transactions in the three months be-

fore November. The statement for the period ending December 28, 1985 contained forty-two (42) purchase transactions ending on November 27 and a $75 payment on the account dated November 29, 1985. During November defendant charged items at Elder Beerman six times on November 10, three times on November 11 and six times on November 12. The card was cancelled November 19, 1985 by computerized mailed notice. Plaintiff's employee telephoned defendant and requested return of the card. Shortly after December 5, 1985 the defendant returned the card.

Defendant testified that he was having employment difficulties in the Fall of 1985. He had visited Hilton Head Island for a prospective position there, which he believed would begin shortly thereafter. Defendant explained that he thought his credit limit was $5,000 so that he was surprised when an agent of plaintiff telephoned to state that the limit was $3,500. He explained that the numerous purchases at Elder Beerman were for Christmas presents and clothing.

Defendant worked at the Ivy Tavern Restaurant until mid November, 1985, taking home $300 per week. He maintained that the Ivy Tavern had a credit limit of $100 before calling for authorization for a charge and that he was unaware of a $50 "floor limit". Defendant testified that he had completed a divorce in the Spring of 1985 and was undergoing a mental as well as a financial depression during that year. He relied on the Hilton Head job starting in December, 1985 when he made the purchases in October and November of 1985. Defendant signed the bankruptcy petition on February 1, 1986. The petition was filed February 4, 1986. He may have seen his attorney a few days before signing the petition after obtaining employment with Continental Foods. The defendant has daughters aged 24, 21 and 18 years, one of whom is in college. Defendant's 1985 income was $35,000.

The defendant owed plaintiff $7,172.86 on the January 28, 1986 closing date.

## DECISION

It is often stated that the bankruptcy statute is a remedial statute for the benefit of debtors, and that exceptions to discharge should be construed narrowly, *Davison-Paxon v. Caldwell*, 115 F.2d 189 at 191 (Fifth Circuit 1940). The magnitude of the use of credit cards has resulted in some change in the relationship between debtor and creditor with respect to the implied representation that the card user has the ability and intention to pay for the charge incurred. An excellent review of 11 U.S.C. § 523(a)(2)(A) is presented in the decision by Bankruptcy Judge Kent Lindquist in *Sears Roebuck & Company v. Faulk*, 69 B.R. 743 (Bankr.N.D.Ind.1986). As noted therein, the majority of cases seem to follow *In re American Bank and Trust Co. v. Lipsey*, 41 B.R. 255 (Bankr.PA.1984) and *Montgomery Ward & Co. v. LaBuda*, 37 B.R. 47 (Bankr.M.D.Fla.1984) which hold that use of a credit card is an implied representation that the user has the ability and intention to pay for the charge incurred.

The other line of cases also recognizes the massive use of the credit cards but places emphasis on the lack of face to face contact between debtor and creditor (card holder and card issuer) at the time credit is extended for each purchase. This reasoning resulted in the opinion in *The First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983). There the Court extended the risk of the credit card issuer to the period of time ending with the communication to the card holder of the revocation of the right of the card holder to possession and use of the card. The *Roddenberry* case was based upon § 17(a)(2) of the Bankruptcy Act of 1898 which was not materially changed in 11 U.S.C. § 523(a)(2). We agree with the 11th Circuit Court of Appeals, which held:

[S]ince the difference between § 523(a)(2)(A) and its predecessor, § 17(a)(2) of the Bankruptcy Act are negligible, case law construing § 17(a)(2) serves as a useful guide in applying § 523(a) to (A), *Birmingham Trust National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985).

In the analysis of the *Faulk* case, supra, the Court notes that the credit card issuers are in a different category from other extenders of credit, because credit card issuers should not have the concept of "implied representation" that the user has the ability and intention to pay for the charge incurred at the time the card is used.

In the *Faulk* case, the Court infers that the use of a credit card by a debtor is an implied representation of debtor's present "intent" to pay for charges incurred not his "ability" to pay for the charges incurred, for the purpose of excepting from discharge any debt for money obtained by fraud or false representation. As is clear from *In re Faulk supra,* proof of actual fraud will prevent credit card debt from being dischargeable in bankruptcy.

■ The case of *In re Carpenter,* 53 B.R. 724 at 730 (Bankr.N.D.Ga.1985) suggests a number of factors to consider in determining whether a charge card debt is nondischargeable. These factors are not exclusive and should be given equal weight by a court in determining dischargeability of charge card debt. The factors are as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

■ In considering the particular circumstances in the instant case, the Court is convinced that those charges made above the credit limit of $3,500 are nondischargeable. The charges made in October and November were in a markedly different pattern from the earlier charges in number and in frequency at the same store. There is significance in the fact that so many of the numerous charges were made in an amount less than $50, the "floor limit" for a telephone authorization from the issuer of the card. At the time those charges were made the debtor's employment status was poor. He knew that the Ivy Tavern position was precarious and he had only a prospect for other employment which failed to mature. The defendant was familiar with the use of credit cards as a merchant in his capacity at the Ivy Tavern. Though he testified the floor limit for telephone authorization there was $100, he was sophisticated enough to understand the difference in "floor limits" from a department store and a restaurant. The sudden increase in the use of the card in October, continuing in November and early December is the type of change in buying habit which indicates an intention to abuse the credit. The charge transactions were for Christmas presents and not for necessaries.

Defendant made payments on the card indicating an intent to pay for his charges on September 3 and September 23, 1985. The payment made on November 27 after being required to return the card was "too little and too late" to prove such intent, there being no payment made in October or before the closing date for the November statement on November 28, 1985.

In analyzing all the facts of this case and applying the factors enumerated in *Carpenter,* supra, the Court finds that the debtor should have known that his credit limit was $3,500, since it was clearly printed on each of the statements he had received after he received the card. The limit was also easily seen on the solicitation cou-

pon which initiated the credit-debtor relationship in July 1985.

Having analyzed the facts of this case and applying the factors enumerated in *Carpenter*, supra, the Court finds that the evidence is clear and convincing that those charge transactions made beyond the credit limit of $3,500 were made with no intention to repay and are nondischargeable.

IT IS, THEREFORE, ORDERED AND ADJUDGED AND DECREED that the liability of defendant to the plaintiff is nondischargeable in the amount of $3,672.86.